UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UTSHO ROZARIO, individually, and NOTAN
EVA COSTA, individually and as Administrator of
the ESTATE OF WIN ROZARIO,

                                        Plaintiffs,

              - against -

THE CITY OF NEW YORK, a municipal entity;
SALVATORE ALONGI, MATTHEW
CIANFROCCO, and NYPD Officers JOHN DOE
1-10, individually and in their official capacities as
New York City Police Department Officers,

                                        Defendants.

---

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

1:25-cv-5203

---

       Plaintiff UTSHO ROZARIO, individually, and Plaintiff NOTAN EVA COSTA,

individually and as Administrator of the Estate of Win Rozario, by and through their attorneys at

Beldock Levine & Hoffman LLP, allege as follows:

## PRELIMINARY STATEMENT

       1.      This is a civil rights action brought by the family and estate of Win Rozario, a 19-

year old who was killed by two New York City Police Department ("NYPD") officers on March

27, 2024 in front of his mother and 17-year old brother after calling for help. Plaintiffs Notan Eva

Costa and Utsho Rozario were attempting to de-escalate an interaction that was escalated by police

officers Defendants ALONGI and CIANFROCCO. Defendants ALONGI and CIANFROCCO are

not mental health professionals and do not have the requisite skills or training by their employer,

the City of New York, to support individuals in the midst of mental health crises. Win Rozario's

death was caused by flagrant violations of his constitutional rights, including the Fourteenth and

Fourth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, as well as

under the laws of the State of New York, and resulted in violations of the rights of Plaintiffs Notan Eva Costa, who goes by Eva, and Utsho Rozario.

2.      The Defendant Officers knew that Mr. Rozario was experiencing a mental health episode when they arrived, but instead of calling for a non-police health-focused response, or utilizing de-escalation techniques to accommodate Mr. Rozario's mental disability, Defendants escalated at every turn. Defendant Officers' quick resort to force, repeated and loud shouting, and aggressive actions escalated and exacerbated the situation, making Mr. Rozario fear for his life, Eva fear for her son's, and Utsho fear for his mother's. After a physical confrontation, Defendants ultimately shot and killed Mr. Rozario while he stood mere feet away from his mother, Plaintiff Notan Eva Costa, and brother, Plaintiff Utsho Rozario.[1]

3.      Through these deliberate and intentional acts, Win Rozario was denied his right to be free from excessive force and unreasonable seizure.

4.      Mr. Rozario's estate and his mother and brother now seek redress for the substantial injuries they suffered, including but not limited to: (i) compensatory damages for physical injury, psychological and emotional distress, and financial loss caused by the illegal actions of Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including attorneys' fees and costs, as this Court deems just and equitable.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over their state law claims pursuant to 28 U.S.C. § 1367.

---

[1] Body camera footage is available at: https://ag.ny.gov/osi/footage/win-rozario.

6.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiffs' claims arose in the Southern District of New York.

8.      Plaintiffs served their Notices of Claim upon the City of New York on June 25, 2024, within ninety days of the events giving rise to their claims.

9.      On November 4, 2024, Plaintiff Utsho Rozario appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

10.      On November 4, 2024, Plaintiff Notan Eva Costa appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

11.      Plaintiff Notan Eva Costa was appointed administrator of the Estate of Win Rozario on May 23, 2024.

## JURY DEMAND

12.      Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## PARTIES

13.      Win Rozario was a 19-year-old immigrant from Bangladesh who, at the time of his death on March 27, 2023, resided in Queens, New York.

14.      Plaintiff UTSHO ROZARIO is the brother of Win Rozario. He was at all times relevant to this action a resident of Queens, New York.

15.      Plaintiff NOTAN EVA COSTA is the mother of Win Rozario. She was at all times relevant to this action a resident of Queens, New York.

16.      Plaintiff NOTAN EVA COSTA was appointed by the Surrogate's Court of Queens

County as the Administratrix of Mr. Rozario's Estate. She is a resident of the United States and of the State of New York and resides in Queens County.

17.    Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York.

18.    The City is authorized by law to maintain a police department, and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers and detectives.

19.    Defendants SALVATORE ALONGI and MATTHEW CIANFROCCO (also referred to herein as the "Defendant Officers" or the "Officers") are the NYPD Officers who unlawfully used excessive and deadly force on Mr. Rozario. They are sued in their individual and official capacities as NYPD officers.

20.    The JOHN DOE Defendants are the NYPD Officers who unlawfully detained Eva and Utsho Rozario. They are sued in their individual and official capacities as NYPD officers.

21.    At all relevant times, the Individual Defendants acted under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the City and/or the NYPD, and incidental to the lawful pursuit of their duties as agents, employees, and/or officers of the City and/or the NYPD.

22.    At all times relevant herein, Defendants SALVATORE ALONGI, MATTHEW CIANFROCCO, and JOHN DOEs 1-10 violated clearly established rights and standards under the United States Constitution, of which reasonable police officers in their respective circumstances would have known.

## **STATEMENT OF FACTS**

### ***The Rozario Family's Arrival in New York***

23.     In 2014, the Rozario family immigrated from Bangladesh to New York hoping to build a new life. Win was nine years old.

24.     Throughout his life, Win struggled with depression and anxiety.

25.     He was briefly hospitalized in 2022 and 2023 relating to his mental health.

26.     However in the six months before his death, Win's mental state had been steadily improving. Win was taking medication and receiving treatment for his mental illness.

27.     Just a week before his death, Win reported to his doctor that he was feeling "much better" and "less anxious" after a recent adjustment of medication.

### *The Day of Win Rozario's Death*

28.     In the morning of Wednesday, March 27, 2024, Win Rozario called 911 on himself, telling the operator, "I think my son is on drugs and he's acting [] erratic."

29.     Mr. Rozario lived at home with his father, Francis Rozario, mother, Plaintiff Notan Eva Costa, and younger brother, then-17-year-old Plaintiff Utsho Rozario.

30.     Responding to the dispatch, Defendants ALONGI and CIANFROCCO arrived at the Rozario family house in the Ozone Park neighborhood of Queens.

31.     Francis Rozario was at work and was not home at the time of the incident.

32.     Defendants ALONGI and CIANFROCCO were both long-serving NYPD Officers stationed at the 102nd precinct. Defendant ALONGI has been a NYPD Officer for 17 years, and Defendant CIANFROCCO has been a NYPD Officer for 10 years.

33.     When Defendants ALONGI and CIANFROCCO arrived at the Rozario family house, Utsho Rozario opened the door.

34.     Utsho had stayed home from school that day to help his support Mr. Rozario during a depressive episode.

35.    While in the doorway of the home, Utsho appeared calm and entered into a conversation with Defendants ALONGI and CIANFROCCO while they remained outside.

36.    The Defendant Officers wore full uniforms, with guns and tasers visible in their holsters.

37.    During this conversation, the Defendants learned that Win had called the police on himself and that he was having a mental episode.

38.    The Defendants used derogatory terms related to mental health diagnoses, asking 17-year-old Utsho whether his older brother was "a bipolar" or "schizo."

39.    Utsho was not aware of a specific diagnosis, and he told the Defendants this. He also told the Defendants that he did not believe Win had taken any substances.

40.    Upon learning that Mr. Rozario was having a mental episode, Defendants did not call for a crisis intervention team.

41.    After a brief conversation, Defendants ALONGI and CIANFROCCO followed Utsho up the stairs and into the Rozario family's second-floor apartment.

42.    Upon seeing the Defendant Officers, Mr. Rozario, who was still in the middle of a mental health episode, turned around and walked towards the back of the kitchen, which was connected to the living room. Eva followed him into the kitchen.

43.    Mr. Rozario retrieved a pair of small yellow kitchen scissors. Eva immediately grabbed Mr. Rozario's arms and pulled him back.

44.    Defendant ALONGI drew his taser and Defendant CIANFRACCO drew his gun, pointing it in the direction of Mr. Rozario and Eva.

45.    Defendant ALONGI tased Mr. Rozario. Mr. Rozario convulsed while Eva held onto him, begging the Officers not to hurt her son.

46.    Defendants began aggressively and loudly shouting at Eva to "let go" of Mr. Rozario and "back off."  The laser from Defendant ALONGI's taser repeatedly landed on Mr. Rozario.

47.    Eva continued to wrap her arms around Mr. Rozario and begged the officers to leave her son alone and not to shoot him. She was worried that the Defendants would harm her son, and she wanted to de-escalate the situation by retrieving the scissors from Mr. Rozario, which she believed she could do safely.

48.    Indeed, Mr. Rozario made no efforts to harm his mother at any point. In fact, Eva appeared to have a calming presence on Mr. Rozario.

49.    Around this point, Defendant CIANFRACCO holstered his taser and took out his gun.

50.    The force of Defendant ALONGI's taser eventually knocked over Mr. Rozario. Eva picked up the scissors and held them, while still holding onto Mr. Rozario.

51.    The Officers did not ask Eva to give them the scissors. Their only command was for Eva to get away from Mr. Rozario, who was no longer holding the scissors and was not moving towards the Officers.

52.    Mr. Rozario stood empty-handed, on the opposite end of the kitchen from the Officers. Eva continued to hold onto Mr. Rozario and begged the Officers not to shoot her son.

53.    Utsho pleaded with the Defendants, "please don't shoot my mother."

54.    With his taser still pointed at Win, Defendant ALONGI responded, "We're not. Tell her to get the fuck out of the way," referring to Utsho's mother.

55.    Eventually, Eva backed away from Mr. Rozario, again pleading with Officers not to shoot Mr. Rozario.

56.     Defendant Officers responded only by shouting at Eva to get out of the way.

57.     When Eva backed away from Mr. Rozario, Mr. Rozario was not holding the kitchen scissors and was not moving towards the Officers.

58.     Rather than use the opportunity to de-escalate the situation or employ any other techniques to increase safety, Defendants did the opposite: they escalated.

59.     Without issuing a warning or command, Defendant ALONGI tased Mr. Rozario a second time. At that point, Mr. Rozario had not been carrying scissors, he had not been moving towards Defendants, and he had been standing on the opposite end of the kitchen from Defendants, who stood in the living room.

60.     The Defendants demonstrated no evidence of being trained on how to interact with individuals with mental disabilities. For example, Defendants ALONGI and CIANFROCCO did not display non-threatening, inviting body language, use a calm tone or engage in active listening, or attempt to de-escalate and slow down the situation.

61.     Responding to the pain of the taser, Mr. Rozario screamed, pulled the taser ends off of his body, picked up the scissors from the kitchen chair, and moved towards the Defendants while Eva reached for his arms.

62.     Defendants ALONGI and CIANFROCCO backed away further into the living room and drew their guns.

63.     Mr. Rozario followed them to the living room, with Eva right behind him.

64.     Eva grabbed Mr. Rozario's right hand, which held the scissors.

65.     Defendant ALONGI yelled, "shoot him," and Defendant CIANFROCCO fired a shot from close range into the back of Mr. Rozario's arm. When this shot was fired, Eva had still been holding onto Mr. Rozario's arm which held the scissors.

66.     Eva pushed Mr. Rozario back into the kitchen. Utsho ran to his mother and tried to move her out of the way. The three of them struggled in the doorway for a moment as Utsho tried to move his mother and his mother tried to hold onto Mr. Rozario.

67.     Defendant ALONGI reloaded his gun from the living room. The Defendants continued to point their guns at Utsho, Eva, and Mr. Rozario. Utsho screamed, "please don't shoot my mom."

68.     Utsho and Eva eventually fell to the ground in the doorway between the kitchen and the living room. Their bodies blocked the pathway between Mr. Rozario and the Defendants.

69.     Mr. Rozario picked up the scissors, which had fallen from Eva's hands. Utsho and Eva still blocked the path between the Defendant Officers and Mr. Rozario.

70.     Defendant CIANFROCCO then shot Mr. Rozario in the chest.

71.     Mr. Rozario stumbled back.

72.     Defendant CIANFROCCO then shot Mr. Rozario in the chest several more times.

73.     In total, in the period that Mr. Rozario had been standing behind his mother and brother, already weakened from the first gunshot, Defendant CIANFROCCO shot Mr. Rozario in the chest four times.

74.     After each of these shots, Defendant CIANFROCCO had enough time to consider whether to fire another shot.

75.     Mr. Rozario did not move towards Defendant CIANFROCCO after any of these shots.

76.     Still, Defendant CIANFROCCO chose to continue firing shots.

77.     Eva and Utsho were right next to Mr. Rozario when these shots were fired.

78.     As Defendant CIANFROCCO repeatedly shot Mr. Rozario, his mother, Eva,

begged for Mr. Rozario's life.

79.     After being shot five times, Mr. Rozario collapsed onto the floor.

80.     The Defendant Officers pushed Eva out of the kitchen as she attempted to run to her dying son's side.

81.     Mr. Rozario writhed on the floor in excruciating pain from being shot. He was still alive, but he was clearly too weak to pose any threat to the Defendants.

82.     Defendant CIANFROCCO pulled Mr. Rozario's arms behind his back to handcuff him as Mr. Rozario laid on the floor, face-down, screaming in pain. Defendant did so before attempting to administer any medical aid and before calling for emergency medical services.

83.     Defendant ALONGI radioed for additional officers and EMS.

84.     More NYPD Officers arrived in the living room and prevented Utsho and Eva from going to Mr. Rozario's side.

85.     Defendants ALONGI and CIANFROCCO left Mr. Rozario face down in handcuffs for several moments while Defendant CIANFROCCO adjusted his body-worn camera and Defendant ALONGI radioed other officers.

86.     Eventually, Defendant ALONGI directed Defendant CIANFROCCO to turn Mr. Rozario onto his back and attempt to resuscitate him.

87.     At this point, Mr. Rozario was still breathing.

88.     Multiple minutes after Mr. Rozario collapsed from gunshot wounds, Defendant CIANFROCCO began to attempt resuscitation.

89.     Defendant CIANFROCCO did not check Mr. Rozario's vitals first, and he performed only chest compressions without rescue breaths.  During resuscitation, Defendant CIANFROCCO repeatedly removed his hands to gesture while speaking to Officers.

90.     Upon information and belief, Defendant CIANFROCCO first checked Mr. Rozario's pulse thirty-nine seconds after beginning resuscitation, at Defendant ALONGI's direction.

91.     The ambulance arrived on the scene at 2:01 p.m., and reached Win at 2:03 p.m. The responding EMT noted that Mr. Rozario was in critical condition, unresponsive, with no identifiable pulse. Manual resuscitation and defibrillation were attempted, but to no avail.

92.     At 2:22 P.M., the ambulance arrived at Jamaica Medical Center, where Mr. Rozario was pronounced dead.

### The Aftermath of Win Rozario's Death

93.     Shortly after Mr. Rozario collapsed from the gunshots, JOHN DOE Defendants prevented Utsho and Eva from staying with Mr. Rozario, instead moving them into Mr. Rozario's bedroom.

94.     The JOHN DOE Defendants spoke loudly and aggressively to Utsho and Eva, who were told not to leave the room. While Utsho and Eva sat in Mr. Rozario's room, EMTs removed Win's body from the house.

95.     At this point, Eva and Utsho did not know whether Win was dead or alive.

96.     Eva and Utsho repeatedly asked about Mr. Rozario, but Officers told them to calm down.

97.     JOHN DOE Defendants told Eva and Utsho that they would be taken to the police station.

98.     Utsho and Eva did not want to go to the police station, but they did not feel they had a choice.

99.     Utsho asked if he could retrieve his cellphone and change his clothes before being

taken to the police station or change out of his pajamas, but Officers denied his request.

100.    Utsho and Eva were taken to the 106th Precinct. At the station, Officers placed Utsho and Eva in a room, where they waited before being separated for questioning.

101.    Utsho and Eva did not feel free to leave the station.

102.    Upon information and belief, Defendant Officers never told Utsho and Eva that they were free to leave the station.

103.    While at the police station, Utsho asked NYPD Officers if he and Eva could return home after being released. Officers told them that they could not.

104.    Eva was questioned first. Officers took Eva into a room and asked her about the events of the day and about prior, intimate details regarding Mr. Rozario's mental health and whether he had a propensity for violence.

105.    Only after finishing Eva's questioning, Defendant Officers informed Eva that her son, Mr. Rozario, had died from the bullet wounds. Eva began to wail.

106.    At this point, Officers had begun questioning Utsho in a separate room. Utsho did not yet know that Mr. Rozario had died, but he could hear his Eva's wailing during questioning.

107.    Only after the Defendant Officers had finished questioning Utsho did they inform him that his brother, Mr. Rozario, had died.

108.    At this point, Defendant Officers told Eva and Utsho that they could speak to an attorney or leave the station. This was the first time that Utsho and Eva were informed that they could consult an attorney or leave the station. They left.

109.    Defendants told Utsho and Eva that they were not permitted to return to their home. Defendant Officers also prevented Mr. Rozario's father and an individual to whom the family was renting a room from returning home.

110.    Officers did not tell the Rozario family when they would be allowed to return home, nor did they allow anyone to grab personal items.

111.    Officers ignored a request from Utsho asking whether he could pick up his mother's diabetes medication from the house, which she needed.

112.    Officers also refused to allow Utsho to enter the apartment to feed the family cat.

113.    In total, Utsho and Eva were prevented from returning home for three days.

114.    At no point did Defendants offer to assist Utsho and Eva with securing alternative accommodations.

115.    When Utsho and Eva retuned home, they found that the house looked the same as it did when they were forced out. Mr. Rozario's blood still covered the floors and cabinets.

### *A Custom, Policy, and Practice of Failing to Properly Handle Individuals with Mental Illness*

116.    On March 27, 2024, Defendants ALONGI and CIANFROCCO violated NYPD policies when they encountered Mr. Rozario. These violations were a direct result of the Defendant CITY OF NEW YORK's deliberate indifference to individuals with mental illnesses.

117.    An EDP is defined by the NYPD Patrol Guide Section 221-13 as a "person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner in which a police officer reasonably believes is likely to result in serious injury to himself and others."

118.    Prior to entering the apartment and at the time of the shooting, Mr. Rozario was identified by the Defendant Officers as a possible EDP.

119.    As such, Defendants were required to follow certain rules and regulations of the NYPD, some of which are outlined in the NYPD Patrol Guide and which required Defendants to employ particular methods and to otherwise use reasonable care in their treatment of Mr. Rozario.

120.    Despite the foregoing, Defendants failed to follow the Patrol Guide and other

generally accepted standards. Instead, they used excessive force and were otherwise wantonly reckless in the manner in which they treated Mr. Rozario, in complete disregard for the preservation of his life and, in doing so, shot and killed him.

121.    Upon learning that Mr. Rozario was having a mental episode, Defendants ALONGI and CIANFROCCO should have requested the response of a patrol supervisor and an ambulance, as required by Section 221.13 of the NYPD Patrol Guide.

122.    Section 221-13 of the NYPD Patrol Guide also states that Officers should "avoid any action which might agitate or provoke the EDP," "attempt to slow the pace of the incident and establish dialogue with the EDP," and "make every effort to de-escalate the situation the situation through tactical communication."

123.    The Defendant Officers knew that Mr. Rozario was acting in an emotionally disturbed manner and failed to follow the Patrol Guide protocol.

124.    The Defendant CITY OF NEW YORK was or should have been aware of police officers' past poor treatment of emotionally disturbed persons, yet, through its policymakers, failed to adequately train police officers regarding the mental health care needs of citizens. Said inaction constitutes deliberate indifference that caused the assault and death of Mr. Rozario.

125.    Since 2015 alone, at least twenty people—seventeen of whom were people of color—have been killed by police in New York City while experiencing a mental health crisis.

126.    The vast majority of the NYPD officers involved in these incidents were never disciplined for their conduct.

127.    A January 2017 Report by the New York City Department of Investigation, Office of the Inspector General for the NYPD ("OIG-NYPD"), detailed longstanding deficiencies in the NYPD's handling of responses to individuals with mental disabilities or perceived mental

disabilities, and specifically highlighted deficiencies in its training.

128.    The deficiencies highlighted by the OIG-NYPD Report included the NYPD's "failure to fully integrate and use [crisis intervention training or "CIT"] within the totality of NYPD's everyday policing" and its lack of a CIT coordinator to "consider how to adjust the Department's relevant policies and Patrol Guide provisions on mental health responses" or "improve the Department's collection of data and analysis on the large number of crisis incidents that take place in New York City."[2]

129.    The OIG-NYPD report also pointed out that the NYPD CIT training program did not consistently expose officers to people with mental illnesses, meaning that many officers who complete the training never actually interact with a person with a mental illness during the training. The report recommended that the NYPD ensure that individuals with mental illness are consistently available at CIT trainings or that the NYPD adopt a strategy employed in a number of other cities, whereby officers visit mental health clinics or hospitals in order to interact with patients and providers.

130.    Another deficiency noted by the OIG-NYPD Report is that the NYPD did not conduct any post-training assessment of CIT-trained officers. The report contrasted this approach with the State of Georgia, Washington, D.C., and the City of Los Angeles, all of which require some form of assessment following the training.

131.    The OIG-NYPD report made clear that encounters with emotionally disturbed persons present "the potential for lethal outcome" if handled improperly.[3] Multiplied across the approximately 180,000 mental health calls that the City received in 2019, the potential for lethal

---

[2] OIG-NYPD, *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis*, at 1 (Jan. 2017), http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf.
[3] *Id.*

outcomes each year is massive.

132.    Despite the findings of the OIG-NYPD Report, as well as other acknowledgements of the need for specialized training, particularly in regard to de-escalation techniques, the City's efforts to improve mental health crisis response training have been woefully inadequate and ineffective. In fact, in response to yet another NYPD killing of an individual experiencing a mental health crisis, City officials who helped craft the NYPD's de-escalation training told the press in 2020 that the NYPD had "never really committed to making it work."[4]

133.    Indeed, in 2020, the NYPD's specialized mental health crisis response training program was abruptly halted with no alternative put in place.

134.    Moreover, as the NYC Office of the Public Advocate stated in its 2022 Update to its recommendations to improve the City's responses to individuals in mental health crisis: "As we have seen with the avoidable deaths of individuals in crisis, having CIT-trained officers respond is not a guarantee that the situation will be deescalated. . . . [I]n order to mitigate further harm and deaths, the City should strive for mental health professionals as the default response for mental health crises rather than law enforcement."[5]

135.    Police officers are taught to deter non-compliance by authoritative tones and stances. However use of aggressive tones and attempts to assert control can make a person frightened and feel stressed and anxious, particularly for individuals experiencing a mental health crisis, who often endure greater trauma and fear when police respond to them.

---

[4] Eric Umansky, *It Wasn't the First Time the NYPD Killed Someone in Crisis. For Kawaski Trawick, It Only Took 112 Seconds*, ProPublica, Dec. 4, 2020, https://www.propublica.org/article/it-wasnt-the-first-time-the-nypd-killedsomeone-in-crisis-for-kawaski-trawick-it-only-took-112-seconds.
[5] Office of the Public Advocate, Improving New York City's Responses to Individuals in Mental Health Crisis 2022 Update at 7, Mental-Health-Updates-2022c-AMS8L6y_znBl.pdf; see also e.g., Michael S. Rogers et al., Effectiveness of Police Crisis Intervention Training Programs, 51 J. Am. Acad. Psych. L. 1, 1, (2019) ("There is little evidence in the peer-reviewed literature . . .that shows CIT's benefits on objective measures of arrests, officer injury, citizen injury, or use of force.").

136.    In October of 2024, the Department of Justice filed a statement of interest in *Greene et al. v. City of New York, et al.,* 1:21-cv-05762-LAP, Dkt. No. 238, where the DOJ asserted that "NYPD officers are not qualified health professionals capable of providing on-site health assessments and stabilization or critical determinations regarding the need for further treatment during a mental health crisis . . . Their training emphasizes command and control, law enforcement, and public safety protection." (internal quotations omitted).

137.    In its public guidance, the Department of Justice has reported that individuals with serious mental illness "face 11.6 times the risk of experiencing a police use of force than faced by persons without a serious mental illness," and that "[i]n recent years, people with mental illness have accounted for between 20% and 25% of individuals killed by law enforcement."[6]

138.    By continuing to provide woefully inadequate training to NYPD officers responding to mental health calls despite being on notice of the inadequacy of its training, the CITY OF NEW YORK, through its policymakers, have maintained a culture of deliberate indifference to the rights of mentally ill individuals.

<u>**COUNT ONE**</u>
**Excessive Force**
**42 U.S.C. § 1983, Fourth and Fourteenth Amendments**
*against Defendants ALONGI and CIANFROCCO in their individual capacities*

139.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

140.    In committing the acts and omissions complained of herein, Defendants ALONGI and CIANFROCCO acted under color of state law to deprive Mr. Rozario of the right to be free from excessive force as protected by the Fourth and Fourteenth Amendments to the United States

---

[6] Department of Justice and Department of Health & Human Services Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities, at 2 (2023), https://tinyurl.com/bdene967.

Constitution.

141.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

142.    The types and levels of force Defendants used against Plaintiff were also unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

143.    Defendants ALONGI and CIANFROCCO personally violated these constitutional rights, or failed to intervene to prevent the violations of these rights even though they had the ability and opportunity to do so.

144.    As a direct and proximate result of being deprived of these constitutional rights, Plaintiffs suffered the injuries and damages set forth above, including pre-impact terror, excruciating pain, mental anguish and awareness of impending death.

145.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## COUNT TWO
**Unreasonable Seizure**
**42 U.S.C. § 1983, Fourth and Fourteenth Amendments**
*Against the Individual Defendants*

146.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

147.    In committing the acts and omissions complained of herein, Defendants JOHN DOES 1-10 acted under color of state law to deprive Plaintiffs Utsho Rozario and Eva Costa the right to be free from unreasonable seizure as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

148.    Defendants' seizure of Plaintiffs herein was done without any judicial warrant, was

18

unreasonable, and was done without lawful justification.

149.    Defendants did not have probable cause to seize, detain, or transport involuntarily Plaintiffs to the police precinct for questioning. Defendants' seizure of Plaintiffs was unjustified and objectively unreasonable.

150.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them, as well as damages to compensate for emotional distress, bodily injury, medical expenses, pain and suffering, and pre-judgment interest.

### COUNT THREE
**42 U.S.C. § 1983 – Substantive Due Process Under the 14th Amendment to the U.S. Constitution**
*Against the Individual Defendants*

151.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

152.    Defendants ALONGI and CIANFROCCO, along with the JOHN DOE Defendants, through their actions alleged above, violated 42 U.S.C. § 1983, by depriving Mr. Rozario, Utsho Rozario, and Notan Eva Costa's rights to be free from wrongful government interference with familial relationships and to companionship, society, and support, as secured by the Fourteenth Amendment.

153.    Defendants ALONGI, CIANFROCCO, along with the John Doe Defendants, deliberately intended to interfere with Plaintiffs' rights to familial association by repeatedly ordering Eva Costa to leave Mr. Rozario's side, and by separating Utsho and Eva from Mr. Rozario in Mr. Rozario's final conscious moments and preventing Plaintiffs from immediately following Mr. Rozario to the hospital.

154.    By reason of the foregoing, Defendants physically and intentionally interfered with

rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment of the United States Constitution.

155.    As a direct and proximate result of this unconstitutional conduct of Defendants, Plaintiffs suffered injury, loss of support, society, guidance and assistance, and economic loss.

## COUNT FOUR
### 42 U.S.C. § 1983, Monell Liability
*Against the CITY OF NEW YORK*

156.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157.    The unconstitutional conduct of Defendants ALONGI and CIANFROCCO was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City whereby written policies are ignored in practice in favor of *de facto* policies.

158.    Defendant CITY OF NEW YORK has, through its policymakers, developed and maintained a culture of deliberate indifference to the rights of people with mental disabilities through its failure to provide adequate training or supervision to subordinates.

159.    Defendant CITY OF NEW YORK, through its policymakers, ratified the unsafe, unconstitutional, and otherwise unlawful treatment of individuals with mental disabilities by their knowledge of, participation in, and/or deliberate indifference to, such actions, as well as their failure to adequately train officers in de-escalation techniques and crisis response to individuals experiencing a mental health crisis.

160.    As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies, and the COUNTY's deliberate indifference, Mr. Rozario's constitutional rights were violated, because of which he suffered substantial damages as an amount to be determined at trial.

161.     As a result of the foregoing, Mr. Rozario suffered the injuries and damages alleged herein.

## COUNT SEVEN
### Wrongful Death
*Against Defendants CIANFROCCO and ALONGI* and the CITY OF NEW YORK

162.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

163.     The acts of the Defendants, alleged herein, individually and collectively wrongfully caused the death of Mr. Rozario.

164.     By reason of the foregoing, Notan Eva Costa and Utsho Rozario sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Rozario.

165.     Defendants are liable for the wrongful death of Mr. Rozario.

166.     As a direct and proximate result of this unlawful conduct, Plaintiffs have sustained damages in an amount to be determined at trial.

## COUNT EIGHT
### Negligent Infliction of Emotional Distress
*Against Defendants ALONGI and CIANFROCCO in their individual capacities*

167.     Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

168.     Defendants ALONGI and CIANFROCCO owed Mr. Rozario, Notan Eva Costa, and Utsho Rozario the duty of care of reasonably prudent law enforcement officers.

169.     The negligent acts of Defendants ALONGI and CIANFROCCO directly and proximately caused Mr. Rozario's death.

170.     Notan Eva Costa, Mr. Rozario's mother, and Utsho Rozario, Mr. Rozario's brother,

were in the zone of danger at the time that Mr. Rozario was shot. Both Eva and Utsho witnessed

Mr. Rozario's tragic death.

171.    As a result of witnessing her son's death and standing in direct proximity of the

shooting, Eva suffered emotional distress.

172.    As a result of witnessing Mr. Rozario's death and standing in direct proximity of

the shooting, Utsho suffered emotional distress.

173.    By reason of the foregoing, ALONGI and CIANFROCCO are liable to Plaintiffs

Eva Costa and Utsho Rozario for the negligent infliction of emotional distress.

174.    Plaintiffs Eva Costa and Utsho Rozario sustained the damages alleged herein as a

direct result of the Defendants' negligent conduct.

## COUNT NINE
### Intentional Infliction of Emotional Distress
*Against Defendants ALONGI and CIANFROCCO in their individual capacities*

175.    Plaintiffs incorporate by reference the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

176.    Defendants ALONGI and CIANFROCCO, through the foregoing acts, did commit

extreme and outrageous conduct and thereby intentionally and/or recklessly caused Plaintiffs to

experience severe mental and emotional distress, pain, suffering, and damage.

177.    All of these acts were the proximate cause of injuries to Plaintiffs.

178.    Defendants committed the foregoing acts intentionally, willfully, and with

malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

## COUNT TEN
### Respondeat Superior
### Against the CITY OF NEW YORK

179.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

180.    At all relevant times, Defendants ALONGI, CIANFROCCO, and JOHN DOES 1-10 were employees of the City and were acting within the scope of their employment.

181.    The CITY OF NEW YORK is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendants ALONGI and CIANFROCCO.

**COUNT ELEVEN**
**Assault and Battery**
*Against Defendants ALONGI and CIANFROCCO*

182.    Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

183.    Defendants ALONGI and CIANFROCCO, without just cause, willfully and maliciously used physical force against Mr. Rozario, causing Mr. Rozario's death.

184.    Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Mr. Rozario's rights, and are therefore liable for punitive damages.

185.    Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

186.    Defendants ALONGI and CIANFROCCO subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving the Plaintiffs of rights, privileges, and immunities guaranteed by Article 1, 6, and 12 of the New York State Constitution, including, without limitation, the right to due process and the right to be free from unreasonable searches and seizures.

187.    As a direct and proximate result of Defendants' deprivations of Mr. Rozario's and Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Mr. Rozario and the Plaintiffs suffered the damages and injuries set forth above.

**COUNT TWELVE**
**Denial or Delay of Medical Care or Medication**
*Against Defendants ALONGI and CIANFROCCO*

188.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

189.    New York Civil Rights Law § 28 provides that "[w]hen a person is under arrest or otherwise in the custody of a police officer, . . . such officer . . . shall have a duty to provide attention to the medical and mental health needs of such person, and obtain assistance and treatment of such needs for such person, which are reasonable and provided in good faith under the circumstances."

190.    Defendant Officers ALONGI and CIANFROCCO denied and/or delayed providing Mr. Rozario reasonable, good faith medical attention while he was in custody of the individual police officer Defendants.

191.    Before attempting to administer any medical care, Defendants handcuffed Mr. Rozario. Defendants delayed the administration of medical care and provided aid in a reckless manner, with Defendant CIANFROCCO removing his hands repeatedly to gesture while speaking to other Officers.

192.    As a result of Defendants' delay/denial in violation of Civil Rights Law § 28, Mr. Rozario suffered serious and significant exacerbation of injuries, resulting in the damages alleged herein.

**COUNT THIRTEEN**
**N.Y.C. Admin. C. §§8-801 *et seq.,* "Qualified Immunity Repeal" Claims**
*Against All Defendants*

193.    Plaintiffs incorporate by reference the allegations set forth in all paragraphs as if fully set forth herein.

24

194.    The New York City Administrative Code §8-803 provides as follows in relevant part:

195.    "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

196.    "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

197.    "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

198.    Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the Individual NYPD Member Defendants are all considered covered individuals. §8-801.

199.    Plaintiff is a "person aggrieved" because Plaintiff was (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such

natural person is the deprivation of such right." *Id.*

200.    Defendant City is liable as an employer, as set out above.

201.    Defendants' uses of force against Plaintiff were unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

202.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

203.    Further, it is not a defense to liability under §§8-801 *et seq.* that a covered individual has qualified immunity or any other substantially equivalent immunity.

204.    Thus, the Court should award both compensatory and punitive damages against all parties (including the City), and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

## COUNT FOURTEEN
### Violations of New York State Constitution
*Against All Defendants*

205.    Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

206.    Defendants subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving the Plaintiffs of the rights, privileges, and immunities guaranteed by Article 1, § 6 and 12 of the New York State Constitution, including, without limitation, the right to due process and the right to be free from unreasonable seizures.

207.    As a direct and proximate result of Defendants' deprivations of Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Plaintiffs suffered the injuries and damages set forth above.

208.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

## COUNT FIFTEEN
### Violations of New York City Human Rights Law
*Against All Defendants*

209.    Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

210.    Defendants subjected Mr. Rozario to the foregoing acts and omissions in a manner that interfered with Mr. Rozario's rights under the federal and state constitutions, including the right to due process of law and to be free from unreasonable seizures.

211.    Defendants acts and omissions were motivated by Mr. Rozario's mental disability, which they were aware of, and were done willfully, wantonly, and/or maliciously.

212.    As a result of Defendants' acts and omissions, Defendants deprived Mr. Rozario of Mr. Rozario's legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## COUNT SIXTEEN
### Conscious Pain and Suffering
*Against Individual Defendants ALONGI and CIANFROCCO*

213.    Plaintiffs reallege and incorporate by reference all the allegations set forth in the foregoing paragraphs as if fully set forth herein.

214.    Upon information and belief, Win Rozario feared for his life before and while

being shot by Defendants.

215.   Upon information and belief, Win Rozario was conscious for several minutes after being shot around 1:55PM, and before he was declared dead around 2:22PM.

216.   The acts of Defendants ALONGI and CIANFROCCO, alleged herein, wrongfully caused Win Rozario to suffer severe physical injuries, excruciating pain, mental anguish, pre-impact terror, and awareness of impending death.

217.   As a direct and proximate result of these Defendants' unlawful conduct, Win Rozario suffered the damages herein alleged.

## JURY DEMAND

Plaintiffs demand a trial by jury in this action on each and every one of their damages claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand the following relief against all Defendants, jointly and severally:

(a)    Compensatory damages, including damages for pain and suffering, in an amount just and reasonable and in conformity with evidence at trial;

(b)    Punitive damages against the Individual Defendants;

(c)    Attorneys' fees;

(d)    The costs and disbursements of this action;

(e)    Interest; and

(f)    Any further or different relief the Court may deem just and proper.


Dated: New York, New York
       June 23, 2025

BELDOCK LEVINE & HOFFMAN LLP

By: /s/_____

David Rankin
Luna Droubi
99 Park Avenue, PH/26th Floor
New York, New York 10016


*Attorneys for Plaintiffs*